All rise United States Court of Appeals, the Ninth Circuit is now in session. Good morning, please be seated. We are here for the in-bank re-argument in Sessom v. Grounds. Is counsel ready? You may proceed. Good morning. May it please the Court, I'm Eric Weaver on behalf of Appellant Sessom. The question that was remanded to this Court by the Supreme Court is, what is the implication of Salinas on the en banc decision? And Salinas has no bearing on the en banc decision. Well, if it didn't have any bearing, why did they GDR it then? If we'd gotten it right, they just could have denied cert and ended it right there. I think that's actually a good question. Very nice. Thank you. Salinas is very clear that it's about custody. And it's at page 2180, it says, the fact that the defendant in Salinas was not in custody takes his situation outside of Miranda. So all of the law pertaining to Miranda and to invocations and whether it has nothing to do with Salinas, Salinas is all about custody. If you're not in custody, you don't have to be given your rights. And if you want to waive them, you have to do so in a clear way. You can't, excuse me, if you want to reserve your rights, you have to do so not by remaining silent, but by asserting your rights. I think Salinas is very clear on that. The fact that Salinas focuses so much on custody, apart from the citation that I just gave, is demonstrated by the fact that the case relies so heavily on Minnesota v. Murphy. Minnesota v. Murphy was also a custody case. And in footnote 5, the court said there, a different question would be presented if he had been interviewed by his probation officer while being in police custody or by the police themselves in custody. Did Salinas win? Pardon me? Did Salinas win? No. So do you think that's a hint from the Supreme Court to look at Salinas and look at the result there and we ought to follow the result there? I think it's a broad stroke. What? It is a very broad stroke. And I suppose that's one of the inferences could be drawn. The law applicable to GVRs is that nothing is to be taken from the decision one way or other in terms of the merits, but rather that it's a suggestion by the Supreme Court that the case should be reconsidered. Your only sort of unusual position here is that you know how most of us on this panel, what most of us on this panel think about this case, right? That's true. So you know what I think. Correct. Or what I thought a year ago. Correct. You know, so what reason have I got to change my mind? Well, I think it's. . . I mean, you don't need to speak at all to the judges who voted with you because presumably they're with you. So talk to. . . I hope so. Well, no, I don't know. And there's one judge who. . . I wasn't here. I don't need to talk to that judge. But I'm just saying, speaking to us, or me particularly, but those of us who voted against you, what is there in Salinas that would cause us to change our votes in the favor, if anything? Or do you pretty much concede that Salinas is no better than Walsh and perhaps even a confirmation of our view? No, I don't concede that it's a confirmation of your view. As you can imagine, I spend a lot of time studying Salinas. It's a wash. There's nothing in Salinas for me to cause me to change my mind, right? I think there's one point in Salinas that may give pause to you, Judge Kaczynski. One of the things that Salinas talks. . . I think Salinas comes a full circle on the question of when, what is needed to invoke. Salinas, right out of the gate, talks about Quinn. In Quinn, which was not a custody case, the court said, Everyone agrees no ritualistic formula is needed in order to invoke the privilege. Miranda adopts essentially a very similar standard. Well, what struck me, if I could ask, in Salinas, other than the fact that only three justices agreed with the holding, was that the justices said there must be a clear invocation of your right to remain silent. We have the same thing in Davis. We have the same thing in every case, that there must be a clear invocation. It must be clearly expressed. The majority in this opinion would try to slice it in a certain way, say, Well, you don't have to have a clear invocation if it's pre-hearing Miranda. But obviously in Salinas it was pre-hearing Miranda. And so now what would we have to do, slice it even thinner? Why isn't clear invocation rule just a rule that cuts across any time that you want to invoke your privilege against self-incrimination? Well, Davis says that after a knowing waiver, you must clearly invoke. So there's two parts to that, knowing and waiver. Although Davis implies both, what Burgess v. Tompkins clarifies, it's the knowing part that they're concerned about. Because in Burgess, what they said is, As a general proposition, the law can presume that an individual who, with full understanding of his or her rights, acts in a manner inconsistent with their exercise, has made a choice to relinquish the prosecution. But Salinas didn't know anything, right? Salinas hadn't heard his rights, so he didn't know anything. Right. But that's true. But he wasn't in custody. Salinas doesn't apply to the situation. Excuse me. Excuse me. Isn't the point, I think Judge Okuda may be driving it, is that the court does invoke Burgess and says it's closely related. So Burgess had had warnings when we had the case before us originally. It was emphasized in Judge Fletcher's majority opinion, which I joined wholeheartedly. The issue was whether or not before warnings you could apply Davis, because the rationale was dependent on the suspect understanding that he had a right to invoke. Now, Salinas seems, at least in Judge Alito's opinion, seems to sort of blur, perhaps blur, the lines between pre and post by invoking it in Salinas, where he didn't have warnings. So he may not have been in custody, but they were still invoking the notion that there has to be a clear expression. So how does that impact the analysis that we set forth previously? I think that the line that the Supreme Court seems to be drawing is a little bit more narrow than what was in the majority opinion, because in the majority opinion they talked about invocation. In this particular case, well, in Burgess, as I said, they talk about knowing waiver. It says that twice in the majority opinion. Once it says, with full understanding of his or her rights, and then in the statement of the decision it says, in sum, a suspect who has received and understood the Miranda warnings has not invoked his Miranda rights, waives the right to remain silent by making an uncoordinated statement. In Salinas, distinguishing the custody situation from the non-custody situation, it says silence after being suitably warned applies to custody. At page 2180, Salinas says, due to the uniquely coercive nature of custodial interrogation, a suspect in custody cannot be said to have voluntarily forgone the privilege unless he fails to claim it after being suitably warned. So there's that same language again. The Supreme Court, in the post-Davis cases, keeps making the distinction between people who know about their rights and people who don't know about their rights. But isn't there further distinction as well? We keep focusing on whether you know or don't know. Obviously, this individual was not given Miranda rights at the outset of the discussion, correct? That's correct. And what does Miranda require in the case of a custodial interrogation? It requires that he be given his rights before he's interrogated. And was this individual given his rights before he was interrogated? Depends on how you define interrogation. Well, I think everyone agreed last time around that what occurred here was a custodial interrogation. Exactly, because the Attorney General takes the position that the interrogation didn't start until after the warnings were given. But the majority agreed before that by employing the strategies from Miranda to dissuade people from exercising their rights, the interrogation had already begun. My question, if I could just finish that up then, is maybe I'm missing something, but I thought everybody keeps focusing on whether the waiver has to be of a certain magnitude or specificity. But how can there be a waiver if you've never given any Miranda rights in the first place? I think that's an excellent question. I don't think you can waive without being given the rights. The whole question focuses on what you know. If you philologically, it seems to me, that if you don't know what your rights are, you can't invoke them according to the language of the Miranda warning. Right. But if I may, so he came in actually knowing that he had a right to counsel. His father had said, presumably, or at least according to the transcript, his father had advised him to get counsel. And so the first thing he said was he – the first thing he said to the police is can you get me counsel, I want counsel or lawyer. Now, so I've been thinking about that because even before we get to Miranda, hasn't he already asserted his rights under the Fifth and Sixth Amendment? I'm sorry, I didn't hear the last part. Before we even get to Miranda in this case, I'll give it to you in something that's sort of a realistic hypothetical. So I have two kids in college at one hour. But I tell them, all right, look, if you ever get stopped by police, especially worry about it around St. Patrick's Day, say, tell them before you say anything, just tell them you want a lawyer. You can throw in my mom's a feral judge. Don't say Ninth Circuit. And so my kids know, they've been raised to know that they have the right because they're in Illinois and Massachusetts. So my kids know they have a right to counsel if they get stopped by a police. So if a police officer, they don't know much else about the Constitution. They know that. If a police officer takes them in for custodial interrogation and they say, my mom says I need to get a lawyer, can you get me a lawyer, isn't that an invocation of your right under the Fifth and Sixth Amendment, which is a right that actually preexists the Miranda right. And it was given to the states. It was held applicable to the states in 1961. But it was in the Constitution in 1791. So you have this constitutional right you're invoking. Why isn't that enough? And what is the purpose of Miranda anyway? It's to tell you what your rights are. But if you come in off the street already knowing you have this right, why are we and you clearly invoke it. So I'm kind of with Judge Acuda on the question of your case rises or falls with clear invocation. Why isn't that enough? And in Escobedo we held, that was pre-Miranda, that if the police interrogated you in violation of your assertion of the right, that your confession was inadmissible. I agree. I think it's a very clear invocation. And, again, this was. I know the first time around I thought, yes, it's a clear invocation. But I reread everything again. And the California Supreme Court kind of says, well, he asked for the lawyer. And then they had a discussion about it. And then they gave him Miranda. So the question is, can you break up the interrogation like that? Because that discussion that they had, while it wasn't asking questions, it was trying to talk him out of asserting his rights. And does the subsequent giving of the Miranda warnings sanitize the prior constitutional violations such that the confession comes in? Well, that's Edwards. Edwards says, once you invoke, unless you relinquish your rights, they can't continue to question you. And the whole point of Edwards is to prevent what happened in this case, which is using time-honored strategies to talk him out of exercising his rights. That's what Edwards is specifically designed to prevent. So once you get past that. But if the Supreme Court had thought that was a clear invocation, as Judge Wardlaw is putting forth and as you're putting forth, then why did they GVR it? You know, that's the, you know, that, you know, I mean, when we've distinguished cases and they GVR it and say this doesn't really apply, then their sights are already on it. You know, they didn't, you know, they used that specifically. But let me ask you this. If, let's assume that Salinas is awash. I don't, I think if Salinas had helped you, you would have won at this point. So let's assume that it's awash. Tell me then how, and if you distinguish it and say it doesn't exactly cover this and I might agree on that, how do you get past the EDPA lens? Then how is this a clear violation of established federal law if Salinas is awash and it doesn't clearly cover it? I mean, the EDPA lens is still a problem for you. The clear, if this case had occurred prior to Davis, Mr. Sessoms would have won because any expression of the right was sufficient. Davis cards out an exception in the... But it didn't occur before Davis. So put us in our real world. How do you get past the EDPA lens after Salinas and after the GVR? The clearly applicable law is Miranda, Quinn, McNeil, et cetera, which say that any expression of the desire for counsel is enough. Davis says, and an interesting fact about Davis... And so we should tell the Supreme Court Salinas has nothing to do with this and just go back to our original... You know, I don't know how the internal workings of the Supreme Court are. I don't know how the GVR was granted. I know that the law says that you don't have to take any inference from the GVR. We cited those cases in our brief. So I can't speculate about why it was sent back. It's pretty clear to me that Salinas has no bearing on this case because it focuses on what your rights or not... Rights you have or don't have if you're not in custody. And it's pretty clear you don't have any rights if you're not in custody. If you voluntarily go with the police and talk to them, you're pretty much on your own. That's what Salinas says. Counselor, can I switch you over to Davis? I am one that voted with the majority. And I've got to tell you, I am struggling with the Davis issue. That was always a close issue for me. And before I divided it because of whether the Miranda right had been given the warning or not. But when you look at whether this was clearly established, well, obviously the Supreme Court of California did refer to Davis or the Supreme Court of Appeals. And by my count, you've got Grant Chase v. Commissioner from the First Circuit, Moore v. Burgess that you cited, United States v. Weisinger from the Seventh, United States v. Satchus-Devon from the Tenth Circuit, the last three of 2012, and then a whole bunch of state courts that referred to Davis in the pre-Miranda setting. Salinas may be awash. But one thing that it does increasingly tighten the screws on is if you want this right, you've got to really assert it. And I watched the tape of Mr. Sessoms. I was moved by the tape of Mr. Sessoms. But if it wasn't clear, my grief. How can you help me understand that under AEDPA, the Supreme Court, state court, generally was wrong in applying Davis in the way it did? It clearly thought it was applying established federal law. If that's right, then your client loses, does he not? Well, I think there's two aspects. One is sort of factually related, and one is about the cases. All of the cases that were cited by the Attorney General. Take Santa Stevens, for example. In none of those cases did the defendant make an ambiguous statement, and then the police proceed to talk him out of it. That's a completely different situation that we have here than we have there. So I think legally the distinction is part two. It's understandable why the Attorney General focuses only on part one, whether it was clear. But there's no case, and I've looked, this has been briefed a hundred times, there's no case out there like this one where the defendant makes a pretty clear statement that he wants an attorney. The police step back, gather their wits, and then talk him out of it. Let me ask you to help me on this then. You say he makes a pretty clear statement that he wants an attorney. Therein lies the rub, isn't it? At least as I see it. Because what Davis seemed to put on the table, and Salinas, albeit factually, somewhat distinctly, enhances the issue that the Supreme Court seems to be saying, if you want this right, you've got to ask for it, clearly, unambiguously. And at least arguably, Mr. Sessoms was not very clear in his implication. He clearly did, as Judge Wardlaw mentioned, he said that his father had suggested that he ask for it. But he didn't say, I want a lawyer. And indeed, if I recall correctly, one of the detectives specifically walked him through whether he wanted a lawyer. And he never did say, I want a lawyer, directly. Correct me if I'm wrong, but that's my understanding. So what I'm wrestling with is the meaning of Davis as colored, if you will, by Salinas. And Salinas, I agree, the facts are a little bit different. You've got the custody, non-custody. But the Supreme Court seems to be saying, you want this right, you've got to really be clear. And I'm thinking that the reason we have the GVR is because the Supreme Court is saying, you've got to look at whether this invocation was clear. How much the pre- and post-giving of the random warning is involved is part of the mystery of it. But don't you agree that the court in Davis says, you've got to be clear? And Salinas kind of reinforces that? Well, I have two points. One, as I said, both Iskey Tompkins and Salinas emphasized the knowing part. There's not knowing here. He hadn't gotten his rights yet. But the second— Well, he maybe didn't know everything, but he certainly knew that he could get a lawyer. His father had told him so, right? Which is why he asked for one. I think another telling point is the way the police reacted. As the opinion noted, the police proceeded to talk him out. But there was one fact that was overlooked in the opinion. Later on, but still before he asked for an attorney, he said, would it be a possible chance that I could call my dad and ask him? And the officer immediately says no. So that's a request formed in exactly the same language. And the officer had no doubt what he wanted there. It's not a question of what the officer knew. It's a question of whether or not your client made a clear request. And your officer may perfectly well understand an ambiguous request. But that's not the test. The question is not what is in the officer's head. The question is what would an objective observer, how would an objective observer view the statement. And specifically, we have to view it through the lens of finding by the state court. We could look at the statement and say, well, we sort of look at it and we think it's pretty clear that he was asking for a lawyer. But here we have the state court that's looked at the very same thing and said, no, it's ambiguous. He didn't ask for a lawyer. All he was saying is my father says I should get a lawyer and, you know, tell me is it possible. I'm not really asking for one. Just tell me if it's possible. That's what the state court says. So how do we get past that? Well, the test. I mean, I tell you right away, if I were making a finding, I would go the other way. The test is a totality of the circumstances test. One of the circumstances is how the officers reacted to the request. The officers unambiguously by their conduct demonstrate they understood he wanted a lawyer and talked him out of it. Even more so later, but before he waves, he uses exactly the same language to ask if he can call his dad and they say no. So how can they not understand it the first time but understand it the second time? They may have understood it both times and thought that the answer was very clear as to the second one, and they may not have known what the answer was as to the first. I mean, they may have simply been confused as to whether or not they have to provide it or not. It's a little bit unclear. So they avoided it. They did what we all do in situations. Most people do in situations like that. And if you have a question, you say, well, I'm not sure of the answer, and you get a question, you're not sure of the answer or you don't like the answer, you sort of don't answer it. But it's not what's going on in their head that matters. What's going on is what the State court said was objectively your client said. Mr. Weaver? Yes. I'm curious on your view. Is it impossible for any indication, as referred to in Miranda, to be ambiguous? And what happens if it is? Well, I think with the subsequent understanding, if it's before the Miranda warnings are given, if any statement that he makes is sufficient, any statement that a reasonable person would think. I mean, that's what the standard that Miranda says. Anything that can be reasonably construed as a request for a lawyer. Once he's been formally, basically what Davis is saying is you have to repeat back what the Miranda warnings are in order to, you have to state your request in the wording of the Miranda warnings. But you can't know what the Miranda warnings are until you've heard them. Even if you've heard them two weeks ago, you're not going to, especially if you're not a lawyer, you're not going to remember exactly what the words are. That's why before the warnings, anything that reasonably suggests you want a lawyer is enough. And afterwards, you can't be expected to use the language of Miranda because you've just heard it. And that's where the clear info, that's why Murchia and even, I mean, Murchias and even Salinas talks about knowing waiver. The fact that that's in there in Salinas I think is very significant. Is that it's, the custodial situation has to be a knowing waiver. How can it be a knowing waiver if you haven't heard the warnings? Counsel, can I just switch for one thing? I just want to be sure I understand your position on this. We've been talking, of course, about the Miranda aspect of this. At least in the 2008 version of this, you also had an IAC claim. Whatever happened to that? Is that still live, buried in there somewhere, ready to be resurrected? Where is that? Well, the court in its decision, because it ruled on the Miranda issue. I know we didn't get to it, but I'm just saying, is it still a live issue? Were we to decide, arguendo, were we to decide the Miranda issue against your client, does the IAC claim remain viable? I think so. I haven't thought about it for a long time. I'll be honest. But in the unfortunate event that you choose the decision, I don't want to take the IAC claim. I understand. Thank you. You've got two minutes. I would like to reserve, if that's possible. Okay. May it please the Court. Jeff Firestone, representing the respondent at the Lake Randy Grounds. No Supreme Court case holds that an ambiguous or unequivocal statement can invoke the right to counsel. And as far as how to treat ambiguous or equivocal statements, the Supreme Court first noted that issue was unresolved in Smith v. Illinois. That was in 1984. Three years later, in Connecticut v. Barrett, the Supreme Court again noted that the issue that was left open in Smith was still unresolved. And it wasn't until 1994 in Davis v. United States that the Supreme Court looked at that issue. And in looking at that issue, the Supreme Court said, you know, twice before it's come in front of this Court, and we've mentioned that the issue as to how to treat an ambiguous or equivocal statement in regards to counsel is unresolved. Well, we address it here on the merits. And what Davis held was that when a suspect makes an ambiguous or equivocal statement that can indicate to a reasonable police officer that he only might be trying to invoke the right to counsel, that the officer is not required to cease questioning. What does Salinas tell us about any of that? And as I said to your opponent, you know, this is an unusual situation. You sort of know what most of us think about the case, have thought about the case. And you need to talk to the judges who are in the majority, plus the new judge on the panel. And tell us what is it that we can get from Salinas that will edge them over to your side. Sure. You don't need to say much to those of us who were with you to begin with. So, you know, arguing the case from basic principles is probably a waste of time at this point. Just talk about Salinas and talk about, except again for one of our colleagues who has not been on the panel before. Sure. Well, Salinas illustrates that there's no bright line between when you have a post-advisement waiver or a pre-advisement waiver. Let me rephrase that. Salinas shows that there's no bright line when you have a post-advisement situation and a pre-advisement situation. And where does it say that? Well, Salinas draws upon the post-advisement cases of Burkus v. Thomas. Well, it draws on Burkus because that's a silence case. And so the real question here is silence. And silence seems to me to be a far different situation than somebody who's talking about, oh, I want an attorney. My dad said I should ask if you want an attorney. So I'm having some trouble understanding why you think that Salinas draws some, you know, takes away some line and says it's all the same. Point me to the language. Well, what Salinas does is Salinas – Point me to the language. I thought it was good to have the key case with you. Salinas cites both Burkus and Davis. And I'm pointing you to the language. It's on page 2183. And what the court says under point C, finally, we are not persuaded by petitioner's arguments that applying the usual express invocation requirement, where a witness is silent during a noncustodial case interview, will prove unworkable in practice. And the court goes on. Petitioner, in a sense, suggests that our approach will unleash complicated and persistent litigation over what a suspect must say to invoke the privilege. But our cases have long required that a witness assert the privilege to subsequently benefit from it. That rule has not proved difficult to apply. Nor did the potential for close cases dissuade us from adopting similar invocation requirements for suspects who wish to assert their rights and cut off police questioning. During custodial interviews. Okay. So then my question is this. I read that. And they're basically saying, look, we adopted Burkus and Davis, and it's not proven difficult for law enforcement or for defendants to function under. But when you go to Davis, what they talk about in Davis is this. It says the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. And then they go on to say, after being given the Miranda warnings, if you don't give an unequivocal waiver, then basically you're out of luck. So when you go to the cases themselves, they're tied to the situation where you have something to knowingly waive. If you haven't given the individual his Miranda rights, how does he have something to knowingly waive? So that's where I need some help. Well, there's a distinction between an invocation and a waiver. And Smith v. Illinois pointed out that those should not be blurred. And as far as what we're dealing with here is the invocation, whether or not there was an invocation as to the right to counsel. His waiver is not an issue. And although counsel references coercion and whether his waiver was voluntary, that's not an issue. That was never certified for appeal. It's not before this Court. The issue is whether or not he invoked his right to counsel. Right. But when you go to Miranda, why doesn't Miranda itself control? Which basically says the reason we require Miranda rights is precisely one of the reasons this kind of case. We don't want officers basically badgering an individual to not ask for a lawyer. And therefore, we're going to raise up this little procedural wall of the Miranda rights. So why isn't this case simply governed by Miranda where they didn't give the Miranda warnings? Okay. If this case was governed by Miranda, then the Supreme Court would not have said in Davis, none of our precedents compel cessation of questioning when a suspect makes an ambiguous or equivocal statement about counsel. Instead, what the Supreme Court of Davis would have said is, although our precedents say this in Miranda, we now carve out an exception. But the Supreme Court didn't do that. And there was nothing that prevented the State Court from applying Davis's clear invocation rule to the pre-advisement context. No Supreme Court authority says that they couldn't do that. And, again, I know the majority before focused on the in any manner language from Miranda. But if in any manner a suspect could assert his rights by making an ambiguous or equivocal statement about counsel, then in Davis the Court would have acknowledged that and said we now carve out an exception. The Supreme Court didn't do that. So, Mr. Firestone, what I understand you to be saying is that we have to look at his initial statements, and was that a sufficiently clear invocation of his right to counsel, irrespective of Miranda later? Yes. Okay. That's what I'm understanding. And in order to do we – in order to determine that, what do we look to? Do we look at the entirety of the circumstances? Do we – I mean, I don't know. The Supreme Court seems to be saying to me and Salinas that they like bright-line rules. Should the bright-line rule be before you start any custodial invocation, read him the Miranda rights. And if they say they want a lawyer before you've read the Miranda rights, we just – clearly enough, then you've violated not Miranda rights. You've violated Fifth and Sixth Amendment rights. They – as far as you need to make a clear invocation, that's what this – from Salinas, you need to be clear. Salinas said no ritualistic formula is required to invoke the Fifth Amendment privilege, but he had to make an express invocation. In Salinas, by making an express invocation, he would be clear that he wants to serve that right. And that's how the Court tied it into the right to silence in Tompkins, is that there's no difference between those. They're closely related, and he – Okay. But here he wasn't silent, right? He said – he said, give me a lawyer. He didn't just say, give me a lawyer. He said – He said other things. That's what my dad told me, to ask you guys to get me a lawyer. Well, and then he – there's a line in the transcript where he actually – there's ellipses, and it says, give me a lawyer. Right. And the transcript – this Court knows that there's not that big of a difference as far as the wording goes between give and get.  The officer testified that he actually said, get me a lawyer. Regardless of that, the trial judge listened to the audio and watched it closely, and it wasn't as if he paused and then said, get me a lawyer. It was one continuous phrase. My dad told me that I should ask you guys to get me a lawyer. Right. Well, here's my situation where my kids know they are entitled to a lawyer, and it's because I've told them. They've never gone to law school, so they get caught up in some sweep of underage drinking or something, or overage, under 21 drinking somewhere, and arrested. And then they're in interrogation somewhere, and they say – my mom says I'm entitled to a lawyer. Get me a lawyer. Why isn't that clear? I mean, it's not unclear just because you haven't given them the Miranda rights. Right. But if you listen to the tape, watch the audio, the way Sessom said it, his original statement has hesitation. His second statement is saying somebody else told me to get – that you should get me a lawyer, not I want a lawyer. Well, the kid's 19 years old, and you're basically saying he should be writing some kind of English grammatical sentence here. The first one of these says, there wouldn't be any possible way that I could have a lawyer present while we do this. So that, I assume you would say, is ambiguous, right? Yes. Okay, because he's got to say, would it be possible to get a lawyer? Okay. So that's ambiguous. Then he says, that's what my dad asked me to ask you guys. Give me a lawyer. So what would he have to say? Would he have to say, I want you to give me a lawyer or give me a lawyer? What's the difference? The way he phrased it, a reasonable peace officer in fair-minded terms could find that a reasonable peace officer could understand that he only might be trying to So why would the reasonable peace officer then, understanding that he might want a lawyer, embark on a whole discussion of why you don't really need a lawyer? Because the problem with lawyers is they kind of sometimes misconstrue things. They take words out of context. Why would a reasonable police officer need to basically convince him he didn't need a lawyer if he didn't understand in the first place that he wanted a lawyer? Well, we would disagree that that's what took place here, that the detective was trying to talk him out of an already asserted right. The detective was informing him of the pros and cons of interrogation and whether No, let's be honest. He wasn't informing him of the pros and cons of interrogation. He was basically saying why you don't need a lawyer because we're not going to do any kind of switch or word games, right? Well, he didn't say you don't I think that's what Kevin was reading from – tell me if I'm wrong, but I think that that language that she was reading is actually in the California – the last reasoning decision of the California State Court. Are you referring to that decision? No, I'm referring to the decision in this case, in essence, the California State decision. Okay. Their findings was exactly what Judge McKeown was just saying. And I'm sorry, I'm not sure what language you're referring to. The give me a lawyer language, and then the following – the follow-up. It's in the California – let's see, where is the California decision? Do you have that one? It's called the People v. Sessoms. I mean, that's the one we're evaluating, right? I have the third district court of appeals opinion. And in looking at the third district court of appeals opinion, what the court said it talks about is two different references. And it says the defendant's first statement – What court are you reading from? Excuse me. It's excerpts of records 34. Unfortunately, in my opinion, what is the number at the bottom of the opinion? It's seven. Seven. And you've got a line number two? It's about halfway down when the court talks about its two different statements. Seven is a big block for us, I mean. It says we find defendant's first statement. Do you have ER 29? I know I'm looking at the same opinion as you. The court of appeals, third district, but, yeah. The first court of the opinion. Where the findings are. Okay, I do have ER 29. So what you were looking at at page, I guess that's 34, was the California appellate court's analysis of those statements, correct? Correct. As far as – I'm now on page 29. Judge, will I see that? With the reference to playing switch games, that's when Sessoms expressed his father's concern that officers sometimes change words up on you. So the officer said, if you don't mind, and I'm paraphrasing here, but if you don't mind, we can put on a recorder. And Sessoms said, yeah, allow the officer to do that. So then they started the recorder. Right. But then at that point, he also goes on and basically says, look, we got the goods on you. And so actually it doesn't even matter what your statement says because we've got – basically he's talking about the jewelry box and the bills. And we've got what Adam and Fred said. He's launching into this after the guy says, oh, give me a lawyer, right? Well, he goes into that after – that's correct. He goes into that talking after he says that. But he didn't – again, Sessoms said, that's what my dad told me to ask you guys was to give me a lawyer. He didn't say give me a lawyer and just that. You said that the – just to clarify, you said in response to Judge McKeown that the first statement, there wouldn't be any possible way that I could have a lawyer present while we do this. That was ambiguous, correct? Correct. Okay. But you agree that it should be read together with the follow-on statement, correct? You don't analyze it in isolation. You don't analyze it in isolation and neither did the Third District Court of Appeal. Okay. I just wanted to make sure that was – And, in fact, on that, the Third District Court of Appeal, what they said is – because going back, you have to look at the totality of the circumstances. Okay. And the Third District Court of Appeal, in their opinion, on page 34 to 35, it talks about we find defendant's first statement is legally indistinguishable from the equivocal remarks in Davis. And then it goes on and it says, nor was defendant's second reference to an attorney an unequivocal request for an attorney. At best, it was a statement of his father's advice to him. We cannot find such a statement to be sufficiently clear that a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney. And you're reading that statement in the Court of Appeal opinion as taking them together? It sounds to me as if they're isolating. Well, it says in the circumstances. It quotes Davis, the circumstances obviously included that moments before the defendant raises negative possibility questions, saying there wouldn't be any possible way I could have a lawyer present while we do this. What's the true answer to that question? What's the correct response to that question? Well, there could be a lot of different responses depending on what he's – What if the police said no instead of going on their rambling journey that they went on? If the police said no, then that would mean that he was incorrect, that there was a possible way that he could have a lawyer present while they do this. Well, in fact, that he had a right to a lawyer. There was a way. There was a right. And isn't the answer to, well, there wouldn't be any possible way that I could have a lawyer present while we do that, isn't the answer to that, I'm going to now read you your Miranda rights because you are in custody. Do you agree he's in custody at this point? He is in custody. And this is a custodial discussion? Yes. Okay. So when a guy says, well, is there any way I can have a lawyer, isn't the answer yes? You can have a lawyer. Here's your Miranda rights. The detective answered that by reading him the Miranda rights. Well, he didn't read him the Miranda rights until he – and he also says, I would like to give me a lawyer. And then he goes on to say, before he gives him the Miranda rights, he basically says, we've got all the goods on you, doesn't he?  In fact, the detective red-flagged some things for him. He says that when one of his cohorts waived his rights, that that surprised him. The detective laid out the law for him and basically said, lookit, if you were to say that you wanted an attorney, we couldn't talk to you. We couldn't get your side, which is a true statement of the law. If he wanted a counsel, the detective couldn't talk to him. And the detective says, in fact, some attorneys, all attorneys at one point or another, will tell you not to talk to the police. So that should have red-flagged it for him as well. And there's nothing wrong with the officer trying to persuade him to talk as long as it doesn't cross. Well, that's exactly what Miranda said was wrong, where in this highly coercive – unless I'm reading Miranda wrong, I say in this highly coercive situation of a custodial interrogation and in situations often where the police try to talk somebody out of getting a lawyer, that's where we're going to implement Miranda rights. So to me it's a question here of timing. They do give him his Miranda rights, but not before they try to talk him out of basically waiving his right. So I guess I'll ask you the same question I asked your colleague, is why isn't this case simply governed by Miranda? Okay. This case is not governed by Miranda for two reasons. If Miranda – if he had made a clear indication that he wanted counsel, then Miranda and Edwards together would hold him – the officer would have to stop and then you could go forward and seek his waiver. As far as Miranda never held and no Supreme Court case has held that an ambiguous or equivocal statement can invoke the right to counsel and cut off questioning – What did the court mean by in any manner? In Miranda, the in any manner language, the way that could be interpreted as a method of communication. So if a – So what's so unclear about, uh, give me a lawyer? If he had only – In any manner? If he had only said, uh, give me a lawyer, that would be clear. That's not what he said. He said, my dad – He said, yeah, that's what my dad asked. Asked me to ask you guys, uh, give me a lawyer. Right. That's what my dad told me to do. And I'm doing it. He told me to ask you, give me a lawyer. But that's not the same thing as saying, give me a lawyer. Give me a lawyer is not the same as give me a lawyer if you preface it with, and not only that, my dad told me to do that. Well – Well, so we have to – we have to determine – Can you answer that question first? Is it the same? It wouldn't be the same if somebody said, well, that's what my dad thinks I should do. In that context. Or say, if somebody else told me I should tell you to get me a lawyer. That's ambiguous. It could be viewed as equivocal. Does he want a lawyer or not? He's expressing somebody else's desire. Somebody else's wishes. Not sure that that's what he really wants to do. So we have that. Just to make it absolutely clear. We would have to say that the state court is objectively unreasonable in saying that his second statement, or the two statements together, were ambiguous. Is that correct? Under AEDPA? Under AEDPA, this court would have to find that no fair-minded jurist could find that his statements were ambiguous. Well, okay. Can you go on, though, further? Because does the state court analyze those two statements that we've been focusing on with the follow-on material in which it tries to talk him out of getting a lawyer? Don't we look at the whole thing? Someone mentioned the totality. You look it up to the point that he made those statements. If those statements constituted an indication based on what a reasonable peace officer and viewed through the AEDPA lens of what a fair-minded jurist could find, that's what you look at. And in considering the totality of the circumstances, we do have the fortunate position of having the tape. So we've got the tone, the inflection, his mannerisms, his demeanor, the hesitation where he makes those statements. And I submit when the court views the tape, and I'm sure many of the court have already viewed it, but when you watch that, he's unsure. Well, he's tentative in this situation. And I think, but is it reasonable to assume when he says, my dad thinks you should give me a lawyer, that he's saying is it reasonable to think that he's also simultaneously saying that I don't want a lawyer? I mean, I don't know why. That would be ambiguous or equivocal, right, saying two things at the same time. Is that reasonable? Well, again, it depends on how it's said. Well, would the Supreme Court have GVR'd this if Salinas deals with ambiguity, correct? Correct. All right. But you would concede it's not exactly on point with the facts in this case? Correct. So you're actually asking us to apply Salinas to this particular saying that it, you know, that that would be the correct inference. But to get to the same place, it would seem to me if Salinas deals with ambiguity, and it seems to me fairly logical that the Supreme Court would not have GVR'd it if they didn't think Salinas had something to do with it. Even if we look at this and say it's not exactly the same case, how could this have been clearly established, and how could it have been an unreasonable application? Even, you know, if Salinas didn't answer the question, how is it even clear now? Well, it's reasonable for the State court to draw, to look at Davis and apply Davis. There was no Supreme Court precedent. Well, but if Salinas doesn't really answer this now and it still isn't really clear, then the State court couldn't have been wrong, could it have been? It couldn't have been wrong, because if there's no controlling precedent, then you have to defer the State court. So there's nothing that prevented the State court from applying the clarification standard to this context. Mr. Feinstein, could I ask you just one question about Salinas, which is why we called this meeting? Do you agree that the Alito, Roberts, Kennedy opinion is controlling and we have to follow it? Yes. What do we do? Well, then what do we do with the six justices who thought that this case was about silence in the noncustodial setting? And I'm sorry, I'm lost on that. There are six justices who didn't agree with the Alito opinion. Well, but the two justices that concurred on the result, at a minimum, they would agree that in order to invoke the Fifth Amendment privilege in the context that they thought it could only be invoked, it had to be clear, and it wasn't clear in the circumstances. So the bare minimum, the narrowest reading on the opinion of Salinas, where all five judges, the three judges in the plurality and the two judges concurring, the narrowest view would be is that if you want to invoke your privilege whenever it applies, you need to be clear. And taking away from that and applying it to this case, that's Sessom's problem. He wasn't clear. His statement was ambiguous and equivocal. So then I believe that's the law from Salinas and that's clearly established and that's the Davis. But I think what Judge Ikuda was alluding to, which is sort of the way I'm looking at it, is under the unreasonable determination of fact prong of AEDPA, which is was the – did the California Court of Appeal make an unreasonable determination of fact in finding that the totality of the circumstances here lent ambiguity to his invocation? Well, this is – it's a – this is analyzed under 2254d-1. It's a mixed question of law and fact. But there's no dispute about what the facts were before the state court. We've got the audio tape – well, the video with the audio. We have the unofficial transcript of what was said. There never has been a dispute about the words that were used except that one discrepancy on whether he had said give or get. So the legal part of it is the conclusion based on these facts that it was ambiguous. Correct. And – But do – then on that same line, we've heard counsel say, well, you look at what the police reaction was. So if you take the first statement, the second statement, and then the police reaction, then you take the tape and you take the tone and all the things and you put that all together, is what we are evaluating a factual determination as drawing the inferences from the circumstantial evidence and then stepping to the unreasonable conclusion? Well, as far as – you would take that into account and go to the conclusion. But as far as the officer's reaction, the officer reacted no differently than the officer would have reacted if he just might have been trying to invoke the right to counsel. And the officer would have done it any different. The officer wants to get escape from him if possible. There's nothing wrong with that as long as it doesn't cross the lines of coercion. There has been no claim raised. It's not exhausted as to whether his waiver was coerced or the voluntariness of his waiver. That's not before this Court. That's before this Court's invocation. And you have to look up to that point. When he made his statement, could a reasonable officer in the circumstances find that he only might be trying to request the counsel? He understood him, one could say, as wanting an attorney present. He understood him. If that was the question he posed, is there a way to get an attorney present, the answer to that would have been yes, whether he gave him the Miranda warning or not. If there was a doubt after the second statement, which the Court of Appeal bifurcates and isolates, they say at best, at best, it was putting forth his father's advice. That seems to me at a minimum that's what it was. So if I look at the California Court of Appeals saying at best, that second statement, whether you take it together or alone, you could say at best it was that. That implies that they were feeling it might not even be rise to that level. So that's a circumstantial, you know, when you take all of the tone, you take everything together, did they come to that statement through a process of finding a fact as to what was going on or just a judgment overall at the end? That was a judgment determination based on the state court's view and that it was not an unreasonable determination that at best he may have been saying his father's advice to him. It wasn't more than that. And there was nothing that required the officers, no Supreme Court precedent compels that the officers must clarify an ambiguous or equivocal statement, although this Court in United States v. Rodriguez has held so. There's nothing that compelled the officers to clarify that. But they did clarify it through the reading of the Miranda warnings. Thank you. Thank you. We have a little bit of time left. Counsel, can I ask you for a quick clarification? I'm looking at the third DCA opinion, page 8 of the opinion, page 35, it's Bates Stamp, 35, I'm not sure if that's E.R. or S.E.R. But the Court says in the first full paragraph, however, even if these statements referring to what Mr. Sessom said were somehow construed to be actual invocation of defendant's right to counsel, such that defendant's Miranda rights were violated. Under the particular circumstances of this case, any such violation did not taint the subsequent confession that was obtained in accordance with Miranda. That's just wrong as a matter of law, isn't it? Absolutely. Because if there were an invocation, a lawyer had to be present, you couldn't ask him anything further. Is that correct? That's correct. Okay. With all due respect, the decision of the Court of Appeal, the Third District Court of Appeal, was sloppy, not only on that point, but also in its reference to Oregon v. LSTAT. I think if we had a clearer decision from the Third District Court of Appeal, probably this never would have happened. I think the issues of being ‑‑ None of that clearly bears on the factual finding, does it? I mean, they could be wrong, dead wrong on all sorts of things, but they pretty clearly made a factual finding, which we have to take into account. And under HPAW, we have to give it regular weight, even though wrong on everything else in the case, right? That's true. But you also have the duty to decide whether it's reasonable or not. It was clearly ‑‑ But it's not affected by the fact that they're wrong on the next issue, on Edwards or the other issue you were talking about. None of that matters, right? I'm sorry. I don't understand the question. The fact that they were wrong on other issues doesn't bear on whether or not the degree to which we defer to them on the factual finding. Well, I think the Court can take into consideration the quality of the analysis in the Court of Appeal opinions in order to determine whether it was unreasonable or not. So I think it is a consideration. Well, can I just ask you this? Under which standard we evaluate the statement that it makes ‑‑ the Court makes it, page 34, that neither statement was an unequivocal or unambiguous request for counsel? Is that a mixed question of fact and law, or as your opposing counsel suggested, or is it a finding of fact? I believe ‑‑ I can't remember the name of the case right now. It's Thompson something. The Court sets the stage by marshalling the facts. It determines what the facts are, and then it makes a legal conclusion based on what the facts are. So it is a mixed question of law and fact. Can I ask you this? The various cases that you've talked about, like at Burgess and Weisinger and so on, were all decided subsequent to the third DCA case, which was decided in 2004. How are we to interpret that? Are we to look at the law as it existed at the time that the DCA handed down this decision, or do we view it through the lens of subsequent developments? I believe it's at the time ‑‑ what the status of the law was at the time the decision was issued, but the subsequent developments can give you an eye as to what the legitimacy is. But Davis clearly did exist at that point. Davis did exist. But the refinements did not. Right. And the main refinement that Salinas is consistent with at Burgess v. Tompkins is the element of knowing. You've got to know what your rights are before you can clearly invoke them. And I think that's what's consistent, and I think that's what means that Salinas actually supports the en banc majority, because it doesn't change that knowing element. I realize my time is up. I appreciate you letting me go over a few minutes. Thank you. Okay. I just thought you would stand submitted. Roger that. Thank you. All right.
judges: Kozinski, Schroeder, Silverman, McKeown, Wardlaw, Fisher, Paez, Callahan, Smith, Ikuta, Murguia